IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

<table>
<tr><td>METZLER CONTRACTING CO. LLC,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Petitioner and Cross-</td><td>)</td><td></td></tr>
<tr><td>Respondent,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>vs.</td><td>)</td><td>Civ No. 10-00516 ACK-BMK</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>ELLE STEPHENS and PAUL STEPHENS,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Respondents and Cross-</td><td>)</td><td></td></tr>
<tr><td>Petitioners.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**ORDER GRANTING IN PART AND DENYING IN PART PETITIONER'S MOTION TO CONFIRM ARBITRATION AWARD AND DENYING RESPONDENTS' PETITION TO VACATE ARBITRATION AWARD**

**I. PROCEDURAL AND FACTUAL BACKGROUND**

Invoking the Court's diversity jurisdiction, Petitioner Metzler Contracting Co. LLC ("Metzler") has moved under Hawai'i state law for the Court to confirm an arbitration award and has filed a memorandum in support of its motion ("Mot. Mem."). (ECF Nos. 1-2.) The arbitration concerned a home on the Island of Hawai'i that Metzler contracted to build for Respondents Elle Stephens and Paul Stephens.[1]

_____

[1] The contract is part of the record before the Court. (Mot. Mem. Ex. A.) This order cites the portion of the contract titled "AIA Document A111-1997, Standard Form of Agreement Between Owner and Contractor" as "Agreement"; cites the portion titled "First Addendum to Standard Form of Agreement between Owner and Contractor" as "First Add."; cites the portion titled "AIA Document A201-1997, General Conditions of the Contract for
(continued...)

The Stephenses have filed a memorandum in opposition to Metzler's motion. (ECF No. 18.) They have also filed a petition under federal law for the court to vacate the arbitration award ("Cross-Pet.") and a memorandum in support of that petition ("Cross-Pet. Mem.").[2] (ECF No. 17.) Metzler has since filed a memorandum in opposition to the Stephenses' petition ("Metzler's Opp'n"). (ECF No. 25.) Both parties have filed replies in support of their positions. (ECF Nos. 26–27.)[3]

The claims submitted for arbitration include so-called "audit claims," including claims by the Stephenses that Metzler overbilled for the project by approximately 70 percent, or about $7 million, that approximately $2.3 million in costs billed were not reimbursable, and that the Stephenses suffered losses of more than $2.5 million due to delay, (Mot. Mem. Ex. L. ("Final Award") at 5–10); "defect claims" by the Stephenses, including claims

---

[1] (...continued)
Construction" as "Gen. Conditions"; and cites the portion titled "Supplementary Conditions to AIA Document A201" as "Supp. Conditions."

[2] Metzler styled its filing as a "motion," which is the word that appears in the Hawaiʻi statute under which Metzler filed. Haw. Rev. Stat. § 658A-22. The Stephenses styled theirs as a "petition," which is synonymous with "application," the word that appears in the federal statute. 9 U.S.C. § 10. The Court uses the parties' chosen words in this order without ascribing any meaning to the difference.

[3] The Court was erroneously informed that neither party had filed certificates of word count with their memoranda. The Court apologizes for its incorrect statement at the hearing that neither party had filed certificates.

involving the residence's doors, stone flooring, roofing system, landscape, plumbing, integrated control system, and fifty-one miscellaneous issues, (id. at 11–36.); and an "affirmative claim" by Metzler for approximately $450,000, the remaining amount billed but not yet paid at the time of the arbitration. (Id. at 10–11.)[4/]

The arbitrator awarded $800,103.40 to the Stephenses on their claims and $645,921.76 to Metzler on its claims. (Final Award at 36–37.) The arbitrator also allocated 75 percent of the fees, expenses, and compensation of the American Arbitration Association and the arbitrator to the Stephenses, resulting in an additional award to Metzler of $106,672.62.[5/] (Final Award at

---

[4/] Additional disputed matters were resolved prior to the arbitration hearing. In 2008, the arbitrator dismissed all claims that had been brought against John F. Metzler in his individual capacity as the managing member and responsible managing employee of Metzler Contracting Co. LLC. (Mot. Mem. Ex. F.) Also, both parties had brought claims for defamation per se, and Metzler had also brought a claim for injurious falsehood, but the arbitrator granted summary judgment to the respective defendants of those claims later in 2008 because he determined that the parties had expressly waived those claims. (Id. Ex. G.) Finally, the parties averred at the hearing that some disputes were resolved during a mediation process that preceded the arbitration.

[5/] The arbitrator allocated the majority of these expenses to the Stephenses because he found that Metzler "was clearly the prevailing party on its Affirmative Claim and in the defense of [the Stephenses'] Audit Claims," and also that Metzler "substantially prevailed in its defense of the myriad Construction Defect Claims made by [the Stephenses]." (Final Award at 38.) The arbitrator further found that the Stephenses had consumed "four of the six weeks of the arbitration hearing"
(continued...)

40.)  All told, the net result of the arbitration was an award of $47,509.02 to the Stephenses, which Metzler has paid.  (Mot. Mem. Exs. N-O.)

## II. APPLICABLE LAW

Although they agree that the standard for evaluating whether to confirm or vacate the arbitration award is the same either way, the parties disagree about whether state or federal law governs that evaluation.[6/]  (Metzler's Opp'n at 33; Stephenses' Reply at 2.)  Metzler seeks confirmation of the award under state law.  The Stephenses, in their cross-petition, seek vacation under the Federal Arbitration Act ("FAA").  Both parties are correct about the result; the state and federal standards for

---

[5/] (...continued)
with the testimony of experts "who lacked the necessary experience and qualifications to testify as experts," "whose testimony was not entitled to much weight when compared with the testimony of [Metzler's] experts," or "whose damages estimates were unsupported and, in many instances, grossly inflated." (Final Award at 39.)

[6/] The cause for the dispute may be that state law provides for attorneys' fees but federal law does not.  See Haw. Rev. Stat. § 658A-25(c) ("On application of a prevailing party to a contested judicial proceeding . . . , the court may add reasonable attorney's fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award."); Menke v. Monchecourt, 17 F.3d 1007, 1009 (7th Cir. 1994) ("[T]here is nothing in the Federal Arbitration Act which provides attorneys' fees to a party who is successful in seeking confirmation of an arbitration award in the federal courts.").  The parties do not mention this reason in their memoranda, but no other reason is apparent.

confirming and vacating arbitration awards are nearly identical
and the Court has previously treated them as such.  See Howard
Fields & Assocs. v. Grand Wailea Co., 848 F. Supp. 890, 895 (D.
Haw. 1993) ("[T]he State of Hawaii has enacted an arbitration act
that is virtually the same as the federal act.").  Based on
recent Ninth Circuit decisions, the Court will evaluate both
Metzler's motion to confirm and the Stephenses petition to vacate
under federal law.

        The contract says that "judgment may be entered upon [a
final arbitration award] in accordance with applicable law in any
court having jurisdiction thereof."  (Gen. Conditions § 4.6.6.)
The contract contains "no express limitation stating that the
Arbitration may only be confirmed under" either state or federal
law; in that situation, a court in this district has previously
applied state law to the confirmation of an arbitration award.
Valrose Maui, Inc. v. Maclyn Morris, Inc., 105 F. Supp. 2d 1118,
1122 & nn.5-6 (D. Haw. 2000).

        Since the decision in Valrose Maui, however, the Ninth
Circuit has developed a "strong default presumption that the FAA,
not state law, supplies the rules for arbitration," and has held
that the presumption only can be overcome by "clear intent to
incorporate state law rules for arbitration."  Johnson v. Gruma
Corp., 614 F.3d 1062, 1066-67 (9th Cir. 2010) (ellipsis and
internal quotation marks omitted) (quoting Fid. Fed. Bank, FSB v.

-5-

<u>Durga Ma Corp.</u>, 386 F.3d 1306, 1311 (9th Cir. 2004); <u>Sovak v.
Chugai Pharm. Co.</u>, 280 F.3d 1266, 1269 (9th Cir. 2002)).  This
presumption applies to the confirmation and vacation of
arbitration awards as well as the arbitration itself.  <u>See Fid.
Fed. Bank</u>, 386 F.3d at 1308, 1311 (deciding consolidated appeals
from the confirmation of an arbitration award and the denial of a
motion to vacate that award and stating that "federal law
governs" the "issues we address on appeal"); <u>see also</u> <u>Johnson</u>,
614 F.3d at 1067 ("[W]here the FAA's rules control arbitration
proceedings, a reviewing court must also apply the FAA standard
for vacatur.") (citing <u>Fid. Fed. Bank</u>, 386 F.3d at 1312).  The
Court will therefore depart from the analysis in <u>Valrose Maui</u> and
will instead consider whether the contract evinces a clear intent
to apply Hawaiʻi's arbitration rules.

  As stated above, the contract does not specify which
law governs the confirmation and vacation of arbitration awards.
(Gen. Conditions § 4.6.6.)  The contract also specifies that
"arbitration . . . shall be in accordance with the Construction
Industry Arbitration Rules of the American Arbitration
Association currently in effect."  (Gen. Conditions § 4.6.2.)
Those rules similarly do not evince a clear intent to choose
state over federal arbitration rules.  <u>See</u> American Arbitration
Association, <u>Construction Industry Arbitration Rules</u> R-49(c)
(Jul. 2003), http://adr.org/sp.asp?id=26397 ("Parties to these

rules shall be deemed to have consented that judgment upon the
arbitration award may be entered in any federal or state court
having jurisdiction thereof.").[7]  Also, Metzler has not argued
that there was a clear intent to have Hawaiʻi's arbitration rules
apply.  For these reasons, the Court will evaluate both the
motion to confirm and the petition to vacate under federal law.[8]

_____

[7] The American Arbitration Association's web site includes
an archive of prior versions of its Construction Industry
Arbitration Rules, but the version that was in effect at the time
the parties signed the contract in 2002 does not appear to be
available online, and the parties have not submitted a copy as
part of the record.  A summary of changes in the July 2003
version is available, however, and does not indicate that this
provision was changed in that version.  See American Arbitration
Association, Summary of Changes to Construction Rules eff. July
1, 2003, http://adr.org/sp.asp?id=22441.  Nor has the provision
been changed since then, although it has been renumbered to R-
51(c) since the October 2009 revision.  See American Arbitration
Association, Archived Rules, http://adr.org/sp.asp?id=29479.

[8] The Stephenses largely base their opposition to the
application of state law to Metzler's motion on the proposition
that "it is federal law that controls issues of arbitrability."
(Stephenses' Reply at 3 (citing Todd Shipyards Corp. v. Cunard
Line, Ltd., 943 F.2d 1056, 1062 (9th Cir. 1991)).)  That
proposition is beside the point, because whether an arbitration
award should be vacated or confirmed is a different question from
whether a given claim is arbitrable.
     In evaluating the phrase "question of arbitrability,"
the Supreme Court has acknowledged that "[l]inguistically
speaking, one might call any potentially dispositive gateway
question a 'question of arbitrability,' for its answer will
determine whether the underlying controversy will proceed to
arbitration on the merits."  Howsam v. Dean Witter Reynolds,
Inc., 537 U.S. 79, 83 (2002).  But the Court went on to say that
"the phrase 'question of arbitrability' has a far more limited
scope," and concerns questions such as "whether the parties are
bound by a given arbitration clause" or "whether an arbitration
clause in a concededly binding contract applies to a particular
type of controversy."  Id. at 84.  Under Howsam, whether an
                                                (continued...)

Although federal law governs the arbitration, including its confirmation or vacation, the contract itself is governed by Hawaiʻi state contract law.  (Gen. Conditions § 13.1 ("The Contract shall be governed by the law of the place where the Project is located.").)  The Court, following the Ninth Circuit cases cited above, interprets the contract as "electing federal procedural rules for arbitration and state substantive law." Fid. Fed. Bank, 386 F.3d at 1312 (citing Sovak, 280 F.3d at 1270); see also Johnson, 614 F.3d at 1066-67 (describing Fidelity Federal Bank and Sovak).

## III. STANDARD

A Court must confirm an arbitration award if the award has not been vacated, corrected, or modified.  See 9 U.S.C. § 9. There are few permissible bases for vacating an arbitration award under federal law, and the Stephenses focus on only one: that the

---

<sup>8/</sup> (...continued) arbitration award should be confirmed is not necessarily a question of arbitrability.

The Court's determination that federal law governs whether the award should be confirmed or vacated is based on the parties' lack of a clear intent to have their dispute governed by state arbitration rules, not the presence vel non of questions of arbitrability.  Even assuming for the sake of argument that the Stephenses present questions of arbitrability in their petition to vacate, those questions would not compel the application of federal law to Metzler's separate motion to confirm.  Otherwise, a party could, by artful pleading, overcome even a clear contractual intent to have state law rules for arbitration apply. Cf. Johnson, 614 F.3d at 1066-67 (applying state arbitration rules where the contract evinced a clear intent to have those rules apply).

"arbitrator[] exceeded [his] powers." 9 U.S.C. § 10(a)(4).

To obtain vacation on this basis, the Stephenses "must clear a high hurdle." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010). "It is not enough for petitioners to show that the [arbitrator] committed an error—or even a serious error." Id. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Int'l Union, AFL-CIO, v. Misco, Inc., 484 U.S. 29, 38 (1987). A court "may ask only whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement." Tristar Pictures, Inc. v. Dir.'s Guild of Am., Inc., 160 F.3d 537, 540 (9th Cir. 1998) (internal quotation marks omitted). "Fail[ing] to arbitrate the dispute according to the terms of the arbitration agreement," however, can exceed an arbitrator's powers. W. Emp'rs Ins. Co. v. Jefferies & Co., 958 F.2d 258, 262 (9th Cir. 1992).

## IV. DISCUSSION

**A.** **The Arbitrator's Power to Consider the Parties' Claims**

The Stephenses claimed in the arbitration that they should not have to pay the full amount billed, which was more than $17 million, because cost increases beyond approximately

$10.4 million had not been accompanied by the formal change-order procedures required by the contract. (Cross-Pet. ¶¶ 26, 45; Supp. Conditions § 7.1.3.1.) They therefore requested that the arbitrator force Metzler to "disgorge $5,879,759 in inappropriately collected sums in excess of the adjusted Contract Sum." (Metzler's Opp'n Ex. B ("Stephenses' Post-Hr'g Br.") at 246.) The arbitrator rejected this claim after determining that there was "doubt and ambiguity as to the meaning of the language embodying the[] contractual bargain," that "the parties through their course of conduct and dealing abandoned the formal change order procedure," and that "[t]hrough their course of conduct and dealing, the parties and their agents collectively treated the Project as a cost-plus-a-fee contract, rather than as a project with a guaranteed maximum price." (Final Award at 4, 7-8.) The Stephenses now argue that the arbitrator exceeded his powers by relying on the parties' course of conduct and dealing to determine that the formal change-order procedure had been abandoned. (Cross-Pet. Mem. at 17-24; Stephenses' Reply at 4-12.)

There are several reasons why the Stephenses' argument is not a basis for the Court to vacate the arbitration award. First, the Stephenses voluntarily submitted their argument concerning these issues to the arbitrator, and cannot now claim that the arbitrator had no authority to decide them. Second, the

clause on which the Stephenses rely does not concern arbitrability.  Finally, the arbitrator's interpretation of the contract neither exceeded his powers nor was implausible and is therefore beyond the Court's authority to vacate.

## 1. Submission of the Claim to the Arbitrator

The Stephenses' argument that the arbitrator lacked the authority to decide an issue that the Stephenses extensively put before him is analogous to the losing side's argument in <u>Tristar Pictures</u>:

> Tristar's challenge to the arbitrator's jurisdiction fails, not only because of the broad language of the arbitration clause, but also because of Tristar's prior actions. Although Tristar did suggest at the arbitration hearing that the arbitrator had no authority to decide certain issues, it chose to argue that the arbitrator lacked authority rather than simply refusing to come to the table.  In this manner, Tristar "by [its] conduct evinced clearly its intent to allow the arbitrator to decide not only the merits of the dispute but also the question of arbitrability." <u>George Day Constr. Co. v. United Bhd. of Carpenters</u>, 722 F.2d 1471, 1475 (9th Cir.1984); <u>see also</u> <u>Ralph Andrews Prods., Inc. v. Writers Guild of Am., West</u>, 938 F.2d 128, 130 (9th Cir.1991) ("A party may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrator to act."). Instead of resting on its present contention that the arbitrator could not grant . . . the relief . . . sought, Tristar put on evidence . . . , tacitly admitting that it was plausible for the arbitrator to assume jurisdiction over the dispute.

160 F.3d at 540.

The Stephenses, apparently dissatisfied with the arbitrator's evaluation of the arguments they presented in the arbitration hearing, now attempt to have the arbitration award vacated on the grounds that the arbitrator never should have evaluated their arguments in the first place. But the Stephenses asked the arbitrator to decide these issues at the arbitration hearing, and so cannot challenge their arbitrability now. See Nghiem v. NEC Elec., Inc., 25 F.3d 1437, 1440 (9th Cir. 1994) ("Nghiem initiated the arbitration, attended the hearings with representation, presented evidence, and submitted a closing brief of fifty pages. . . . Once a claimant submits to the authority of the arbitrator and pursues arbitration, he cannot suddenly change his mind and assert lack of authority.").

The Stephenses devoted fifty pages to the so-called "Audit Claims" in their post-hearing brief to the arbitrator, including their theory that the amount billed over the "contractually authorized Contract Sum of $10,397,462.55" was uncollectable because of the lack of compliance with the change-order procedures. (Stephenses' Post-Hr'g Br. at 205–06 ("[W]hat must therefore be found is that [Metzler] was fully aware of the obligations to prepare change orders, that it failed to meet this obligation and that no enforceable waiver or modification of that obligation was undertaken to relieve [Metzler] of that obligation."); id. at 231–32 ("[Metzler] failed to meet its

burden of proving that Mrs. Stephens intentionally waived and/or modified _any_ contract provisions and in fact admitted that she never directed Keith Wallis not to prepare change orders.").)

The Stephenses cite several cases involving motions to compel or stay arbitration.  See, e.g., <u>HIM Portland, LLC v. DeVito Builders, Inc.</u>, 317 F.3d 41, 42 (1st Cir. 2003); <u>Farkar Co. v. R.A. Hanson DISC, Ltd.</u>, 583 F.2d 68, 69 (2d Cir. 1978); <u>Brookfield-N. Riverside Water Comm'n v. Abbott Contractors, Inc.</u>, 621 N.E.2d 153, 159 (Ill. App. Ct. 1993).  The difference in procedural posture distinguishes those cases from this one.  As <u>Tristar Pictures</u> states, a party must challenge arbitrability in a judicial proceeding instead of, not after, voluntarily submitting the case to the arbitrator.

The arbitrator did not exceed his powers by determining whether the Stephenses were responsible for the amount billed over $10.4 million.  The Stephenses specifically asked him to decide that issue.  (Stephenses' Post-Hr'g Br. at 205–06, 231–32.)  The Court therefore cannot vacate the arbitration award on this basis.  See <u>Nghiem</u>, 25 F.3d at 1440.

## 2. Arbitrability of the Claims

Even if the Stephenses could challenge the arbitrability of the dispute about the amount billed over $10.4 million after presenting their case to the arbitrator, such a challenge would fail because the contract's arbitration clause is

very broad and the provision of the contract that the Stephenses rely on does not concern arbitrability.

### a. Scope of the Arbitration Provision

The contract defines a "Claim" as "a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract." (Gen. Conditions § 4.3.1.)  The contract further specifies that "[a]ny Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in [specified sections], shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration." (<u>Id.</u> § 4.6.1.)[9]

Taken together, these broad provisions include only narrow and defined limits to the subject matter of arbitrable claims arising out of the contract.[10]  <u>See</u> <u>Todd Shipyards</u>, 943 F.2d at 1060 ("Federal courts have taken a broad view of the

---

[9] The specified portions of the contract involve, first, the waiver of claims for "consequential damages," including rental expenses and losses of use, income, profit, financing, business, reputation, and management or employee productivity and services; and second, the waiver of certain claims after the making or acceptance of final payment. (Gen. Conditions §§ 4.3.10, 9.10.4, 9.10.5.)

[10] The Court will address below the procedural requirement that claims be submitted to the architect as a condition precedent to arbitration.

power of arbitrators to decide disputes arising during the operation of a commercial contract, and concerning the composition, meaning, and scope of that agreement. This is particularly true when a contract, like the one here, contains an expansive arbitration clause.").[11/] The claims at issue in these petitions were not excluded from arbitration.

The Stephenses claimed that Metzler had overbilled them by increasing the cost of the home without following the formal change-order procedures and Metzler claimed that the Stephenses had failed to pay the full cost of the home. These claims fall within the arbitration clause's scope because they are claims for payment of money that do not involve "aesthetic effect" or any of the explicitly waived types of claims. (Gen. Conditions §§ 4.3.1, 4.6.1.)

### b. Effect of the Change-Order Clause

The Stephenses nonetheless argue that the arbitrator exceeded its powers when it decided these claims. The Stephenses rely heavily on <u>Western Employers Insurance</u>, and particularly its statement that forcing a party to "arbitrate according to terms for which it did not bargain" exceeds an arbitrator's powers. 958 F.2d at 259. In that case, the parties agreement "require[d]

---

[11/] The clause at issue in <u>Todd Shipyards</u> stated: "Any and every dispute, difference or question between the parties hereto which shall at any time arise after the execution of this Agreement . . . relating to this Agreement, shall be referred to arbitration." 943 F.2d at 1060 (omission in original).

arbitrators to accompany any award with a statement of their
findings of fact and conclusions of law." Id. Other cases that
the Stephenses rely on also involve arbitration clauses that
expressly involve the arbitrability of certain types of claims.
For example, in Polimaster Ltd. v. RAE Systems, Inc., 623 F.3d
832 (9th Cir. 2010), the arbitration agreement specified that
arbitration would take place at the defendant's site, meaning, as
the Ninth Circuit determined, that while Polimaster's claims
against RAE Systems could be arbitrated in California, any
counterclaims could only be arbitrated in Belarus, where
Polimaster is located. See id. at 834-35, 843; see also
Frederick Meiswinkel, Inc. v. Laborers' Union Local 261, 744 F.2d
1374, 1376-77 (9th Cir. 1984) (vacating an arbitration award
where the arbitrator decided an issue that was specifically
excluded from arbitration by the arbitration agreement).

     The contract provision at issue here does not contain
express limitations on arbitrability. With certain exceptions
that the parties do not argue are applicable, the contract
specifies as follows:

> [A] change in the Contract Sum or the
> Contract Time shall be accomplished only by
> Change Order. Accordingly, no course of
> conduct or dealings between the parties, nor
> express or implied acceptance of alterations
> or additions to the Work, and no claim that
> the Owner has been unjustly enriched by any
> alteration or addition to the Work, whether
> or not there is, in fact, any unjust
> enrichment to the Work, shall be the basis of

-16-

> any claim to an increase in any amounts due
> under the Contract Documents or a change in
> any time period provided for in the Contract
> Documents.

(Supp. Conditions § 7.1.3.1.)  This clause does not refer to

arbitration, arbitrability, or the arbitrator, and is part of

Article 7 of the contract, which governs "Changes in the Work,"

rather than Article 4, which governs "Administration of the

Contract," including "Claims and Disputes," "Resolution of Claims

and Disputes," "Mediation," and "Arbitration."  (Gen. Conditions

at 18-24, 26-28.)  The Court concludes that § 7.1.3.1 does not

limit the arbitrator's jurisdiction.  Rather, the section could

serve as the basis for an arbitrator to deny claims based on the

parties' course of conduct—and as previously discussed, the

Stephenses argued to the arbitrator that the section should do

just that.  See supra Part IV.A.1.

Absent any clear indication that the provision applies

to arbitrability, rather than the parties' relations with each

other, and particularly given the "federal policy favoring

arbitration," the claims that the arbitrator evaluated were

arbitrable.  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,

460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration

. . . .").

### 3. The Arbitrator's Interpretation of the Contract

Because the claims were arbitrable, the Court can only

-17-

vacate the arbitration award if the arbitrator's decision was not
a "plausible interpretation of the agreement." Tristar Pictures,
160 F.3d at 541. The decision was plausible, both because the
contract terms plausibly gave rise to ambiguity that entitled the
arbitrator to look to extrinsic evidence to determine the meaning
of those terms and because, regardless of whether there was
ambiguity in the contract, the arbitrator was entitled to
consider the parties' conduct to determine whether contract
provisions, including among other provisions both the change-
order provisions and the anti-waiver provisions, had been waived.

### a. Ambiguity

Under Hawaiʻi law, "extrinsic evidence . . . [may] be
considered by the court to determine the true intent of the
parties if there is any doubt or controversy as to the meaning of
the language embodying their bargain." Hokama v. Relinc Corp.,
559 P.2d 279, 283 (Haw. 1977). Ambiguity can exist within a
contract even if no particular words or phrases are themselves
ambiguous. See id. at 282 ("An ambiguity may arise from words
plain in themselves but uncertain when applied to the subject
matter of the instrument."). The arbitrator, citing Hokama,
determined that there was "doubt and ambiguity as to the meaning
of the language embodying the[] contractual bargain," and
proceeded to "consider[] extrinsic evidence, including oral and
written statements by the parties and their representatives,

their conduct and course of dealing, and the custom and usage of the construction trade, to determine the true intent of the parties to the Contract." (Final Award at 4-5.)

The Stephenses acknowledge that extrinsic evidence may be considered to interpret an ambiguous document, but argue that this is only the case "if the ambiguity arises from the document itself." (Cross-Pet. Mem. at 22 n.11.) As a matter of Hawaiʻi law, the Stephenses are correct; a "court should look no further than the four corners of the document to determine whether an ambiguity exists." Found. Int'l, Inc. v. E.T. Ige Constr., Inc., 78 P.3d 23, 33 (Haw. 2003). The arbitrator's statement that "doubt and ambiguity as to the meaning of the language" arose from "a course of conduct and dealing that varied significantly from procedures contemplated by the Contract Documents," (Final Award at 4), appears to have been erroneous.

Yet that error does not mean that the arbitration award may be vacated, for two reasons. First, mere legal error is not a basis for vacation. See, e.g., Stolt-Nielsen S.A., 130 S. Ct. at 1767. Second, the arbitrator's discussion of the audit claims shows that he found ambiguity within the terms of the contract, despite his statement that the ambiguity arose from the parties' conduct. (Final Award at 5-8.)

There are several contract provisions that, when read together, could plausibly give rise to ambiguity. First, the

contract specifies that "[t]he Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract" and that the "Contract Sum is the Cost of Work as defined in Article 7 plus the Contractor's Fee." (Agreement § 5.1.1.) The same article of the contract provides space for a "guaranteed maximum price," but the parties filled in that space with the term "N/A." (Id. § 5.2.) The parties dispute what "N/A" means; Metzler says that it means "not applicable" whereas the Stephenses say that it means "not available." (Final Award at 6.)

Based on these provisions, the arbitrator could plausibly determine that the Stephenses were required to pay Metzler for the cost of the work as defined in the contract, whatever it was, plus a fee, without reference to any maximum price or change-order procedure. This is not an inherently implausible arrangement; the American Institute of Architects offers a form contract for it. See A-Series: Owner/Contractor Agreements, http://www.aia.org/contractdocs/AIAS076742. This is the interpretation of the contract that Metzler advocated, and the arbitrator ultimately adopted it. (Final Award at 8.)

The contract also provides, however, that Metzler was to prepare a "Preliminary Budget, including an itemized Schedule of Values," based on its "best estimate of the Contract Sum," before it began construction. (First Add. § 6.5.) Metzler did

so, and the preliminary budget was $10,301,541. (Cross-Pet. Mem. Ex. A-5.) The same section of the contract further provides that as the "Schedule of Values is refined . . . a Change Order shall be issued to adjust the Contract Sum . . . ." (First Add. § 6.5.) These provisions, as the Stephenses argued to the arbitrator, could represent a different type of contract: a cost-plus-fee contract with a guaranteed maximum, albeit one that was adjustable.

Faced with these competing interpretations of the contract terms, each plausibly inconsistent with the other,[12/] the arbitrator plausibly determined that the terms of the contract were ambiguous and so turned to extrinsic evidence to determine the parties' intent. (Final Award at 5-8); <u>see also</u> <u>Hokama</u>, 559 P.2d at 282-83.

Based on his assessment of that evidence, the arbitrator determined that the Stephenses' theory was not credible. (Final Award at 8.) That conclusion too was

---

[12/] If the contract was a cost-plus-fee contract with no guaranteed maximum, then the arbitrator could plausibly determine that the preliminary budget did not constrain the contract sum. On the other hand, if the contract sum could not exceed the preliminary budget, as amended, then the arbitrator could plausibly determine that the contract did have a guaranteed maximum, despite its express provision that the guaranteed maximum was "N/A." The former interpretation is consistent with Metzler's contention that "N/A" means "not applicable," whereas the latter is consistent with the Stephenses' contention that it means "not available," in that the contract required Metzler to prepare the preliminary budget after the contract was signed. (First Add. § 6.5.)

plausible, based on the arbitrator's determinations that the parties never negotiated a guaranteed maximum price; that Elle Stephens "agreed to have the pay requests sent directly to her for review and approval"; that she "requested myriad changes after the Preliminary Budget was issued"; that she "chose not to take advantage of the cost protection features in the Contract Documents" after a stage "[e]arly on in the Project [when] four Change Orders were issued"; that Metzler "periodically submitted updated budgets to Mrs. Stephens reflecting th[e] increased costs" due to her requested changes; that the most recent update to the budget, submitted on August 31, 2004, "showed projected costs at $17,285,032 and costs to date of more than $14 million"; and that the "increasing costs on the Project . . . were paid without objection through June 2005." (Final Award at 6-8.)[13/] While making his determination the arbitrator had before him, as Metzler demonstrated at the hearing, a statement from one of the Stephenses' architects that the parties "adopted a different

---

[13/] Another provision of the contract specifies that "[i]n the event of inconsistencies within or between parts of the Contract Documents, or between the Contract Documents and applicable standards, codes, and ordinances, the Contractor shall (1) provide the better quality or greater quantity of work or (2) comply with the more stringent requirement." (Supp. Conditions § 1.2.1.1.)  The parties have not argued that this section of the contract informs their dispute, and it appears to the Court that the provision applies to potential inconsistencies concerning, for example, the quality of materials to be used, or times of day in which workers would be allowed to do noisy work, rather than to the alleged inconsistencies in contract terms at issue here.

procedure from what was set forth in the owner architect agreement; that Elle would review these pay apps on her own and ask . . . questions on an as needed basis," a statement from another of the architects that he was not aware of "any upper limit to the construction contract as to what the . . . contractor could charge the owner," and a statement from Elle Stephens that the Stephenses had not set a limit on what they would spend on the home. (Mot. Mem. Ex. J at 31–32, 34–35.)

In sum, neither the arbitrator's decision to consider extrinsic evidence to interpret the contract terms nor his subsequent interpretation of those terms was implausible, so neither is a ground for the Court to vacate the arbitration award.

### b. Waiver

Even if the contract was unambiguous, and meant what the Stephenses argue it meant, the arbitrator did not exceed his powers by determining that some contract provisions had been waived. The arbitrator found that "[a]lthough the Contract Documents contained detailed contract administration procedures designed to provide cost control protection to Claimants, Mrs. Stephens did not take advantage of those protections and chose not to follow those procedures." (Final Award at 6–7.) Rather, she "agreed to have the pay requests sent directly to her for review and approval, and essentially removed the Architect from

the contract administration process," even as she "requested myriad changes after the Preliminary Budget was issued, which significantly increased the cost of the Project as well as the time necessary to complete the Project." (Id. at 7; see also Mot. Mem. Ex. J at 31–32, 34–35.)

Given the parties' conduct, the arbitrator's determination that certain of the contract's procedures had been abandoned was plausible and rooted in established principles of contract law. For example, in Stewart v. Spaulding, 23 Haw. 502 (1916), a "clause in the specifications provided that 'no extra compensation shall be due the contractor for the performance of any work or furnishing of any material, except in accordance with written agreement or by written order of the architect with the approval of the owner.'" Id. at 511. The Supreme Court of the Territory of Hawaiʻi noted "evidence that in several instances the owner himself had ordered changes to be made for which extra compensation might be claimed," and determined that "if the parties did not live up to the requirement of the specifications neither could set it up to defeat the just claims of the other." Id.; cf. also Wall v. Focke, 21 Haw. 399, 404–05 (1913) (noting that the "law ordinarily presumes or implies a contract whenever this is necessary to account for other relations found to have existed between the parties," such as when there is "evidence that defendant requested plaintiff to render the services or

assented to receiving their benefit under circumstances

negativing any presumption that they would be gratuitous").

The proposition that parties may waive formal change-

order provisions, particularly, appears in numerous cases from

around the nation.[14/]  The Ninth Circuit has held as much in the

_____

[14/] <u>See, e.g.</u>, <u>Penava Mech. Corp. v. Afgo Mech. Servs., Inc.</u>,
896 N.Y.S.2d 349, 351 (App. Div. 2010) ("[O]ral directions to
perform extra work, or the general course of conduct between the
parties, may modify or eliminate contract provisions requiring
written authorizations or notice of claims."); <u>Fraley
Contracting, Inc. v. Pace Pac. Corp.</u>, No. 1 CA-CV 08-0663, 2009
WL 3233816, at *6 (Ariz. Ct. App. Oct. 8, 2009) ("Pace Pacific
orally requested work outside the scope of the contract and
thereby waived the . . . writing requirement as to that
modification."); <u>Daystar Sills, Inc. v. Anchor Invs., Inc.</u>, No.
06L-05-026, 2007 WL 1098129, at *4-5 (Del. Super. Ct. Apr. 12,
2007) (interpreting a contract that had incorporated the same
change-order provisions as the contract in this case and noting
that where "the facts . . . establish that the provisions of the
contract relating to change orders have been waived by the
parties," a court "may award sums based on <u>quantum meruit</u>");
<u>Wisch & Vaughan Constr. Co. v. Melrose Props. Corp.</u>, 21 S.W.3d
36, 41 (Mo. Ct. App. 2000) ("Habitual acceptance of extra work
done on oral change orders in connection with a contract, and
payment therefore, results in waiver of any contract clause
providing that no claims for extra work or material shall be
allowed unless the same be pursuant to a written change order.");
<u>T.W. Morton Builders, Inc. v. Von Buedingen</u>, 450 S.E.2d 87, 93
(S.C. Ct. App. 1994) ("[T]here was evidence of waiver.  The von
Buedingens . . . requested numerous changes without insisting on
written change order forms."); <u>cf. also</u> <u>James Corp. v. N.
Allegheny Sch. Dist.</u>, 938 A.2d 474, 487 (Pa. Commw. Ct. 2007)
(interpreting what appears to be the same change-order provisions
as the contract in this case and stating that "School District,
having directed Contractor to perform the additional work
asserting it was required by contract, cannot now disavow
liability for costs incurred by claiming Contractor did not have
written authorization").
    The Court notes that it found several of the citations in
this footnote in a construction-law treatise.  <u>See</u> Philip L.
Bruner & Patrick J. O'Connor, Jr., 1-2 <u>Bruner and O'Connor on</u>
                                        (continued...)

arbitration context.  <u>See</u> <u>Todd Shipyards</u>, 943 F.2d at 1061 ("In view of the narrow standard with which this court reviews either the factual or legal basis of the [arbitrator's] award, the decision of the arbitrator[] to ignore the change order provision and to base the award on hours actually expended by Todd, is not cause for reversal here.").

The parties (or at least the Stephenses) apparently intended to draft the contract to preclude course-of-conduct claims, but that intent does not render the architect's interpretation implausible.  "It is a well-established rule of law that parties to a written contract may modify, waive, or make new terms notwithstanding terms in the contract designed to hamper such freedom."  <u>Davis v. Payne & Day, Inc.</u>, 348 P.2d 337, 339 (Utah 1960).[15/]  The Stephenses acknowledged as much in their

---

[14/] (...continued)
<u>Construction Law</u> §§ 4:40, 5:109 (2010).  That there is at least one treatise with sections covering waiver of formal change-order provisions, even in the presence of "anti-waiver" clauses (as the treatise terms them), suggests that the arbitrator's conclusion concerning this contract's allowance for waiver was plausible.

[15/] <u>See also</u> <u>Certified Corp. v. Haw. Teamsters & Allied Workers, Local 996</u>, 597 F.2d 1269, 1271 (9th Cir. 1979) ("It is settled that in the absence of a statute preventing oral modification of a contract, a written contract can Always be orally modified, even if its express terms prohibit modification except in writing.  'Two contractors cannot by mutual agreement limit their power to control their legal relations by future mutual agreement.'") (capitalization in original) (citation omitted) (quoting 6 Arthur Linton Corbin, <u>Corbin on Contracts</u> § 1295, at 206–08 (1963)); <u>Dickinson Homes, Inc. v. Barrette</u>, No. 282385, 2009 WL 1440968, at *5–6 (Mich. Ct. App. May 21, 2009)
(continued...)

brief to the arbitrator. (Post-Hr'g Br. at 228-29 (discussing the requirements for a showing of waiver).) Because "it has long been the rule that parties may waive a 'no-waiver' clause, and given the parties' conduct, the arbitrator's determination that the parties waived the anti-waiver provisions of this contract was plausible. <u>Lee v. Wright</u>, 485 N.Y.S.2d 543, 544 (App. Div. 1985).

<u>Farkar Co.</u>, which the Court distinguished above on the basis of its procedural posture, <u>see</u> <u>supra</u> Part IV.A.1, is also distinguishable because of the absence of waiver. <u>See</u> <u>Farkar Co.</u>, 583 F.2d at 72 (modifying an order compelling arbitration to exclude a category of claims that the contract specified could not give rise to liability, where there was no determination that the limitation of liability had been waived). Similarly, the arbitrator in this case granted summary judgment to the respective defendants of the claims for defamation <u>per se</u> and injurious falsehood because the parties had expressly waived claims for consequential damages in the contract. (Mot. Mem. Ex. G (citing Gen. Conditions § 4.3.10).) Unlike the provisions in the contract that the arbitrator determined were waived, and

_____

<sup>15/</sup> (...continued)
("Parties may modify contract provisions through a course of conduct, even where the contract contains a restrictive amendment clause, if there is mutual assent to the modification. . . . Here, it is clear from the evidence that defendants requested changes without executing change order forms . . . and that plaintiff acted on the requests.").

particularly § 7.1.3.1, there was no determination that the limitation of liability in § 4.3.10 had been waived.

**B.**         **The Procedural Condition Precedent to Arbitration**

The contract specifies that "Claims . . . shall be referred initially to the Architect for decision," and adds that "[a]n initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due . . . ." (Gen. Conditions § 4.4.1.) The contract also specifies that "[n]o action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing." (<u>Id.</u> § 13.4.2.)

The Stephenses argue that Metzler's failure to refer certain claims to the architect before those claims were submitted to the arbitrator precluded the arbitrator from addressing those claims, such that the arbitrator exceeded his authority by addressing them. The Court rejects the Stephenses' argument, both because the claims were voluntarily submitted to the arbitrator and because the arguments fail on their merits.

**1. Submission of the Claims to the Arbitrator**

The Stephenses particularly focus, in this portion of

their argument, on the arbitrator's consideration of their $1.15 million claim for the replacement of 172 custom-made wenge doors. (Cross-Pet. Mem. at 24–31.)  Of the residence's 185 wenge doors, 124 were exterior doors, and the architect rejected these because "the orientation of the laminated core material in the doors differed from the orientation of the cores depicted in approved Shop Drawings." (Final Award at 11.)  The door manufacturer replaced thirteen of the exterior doors, and the Stephenses sought replacement of the remaining exterior doors along with the interior doors, which the architect had not rejected.  (Id.)

Just as the Court determined above, see supra Part IV.A.1, the Stephenses' argument that the claims concerning doors were outside the arbitrator's authority to decide fails because the Stephenses voluntarily presented those claims to the arbitrator, including their arguments concerning the requirement of submitting claims to the architect, both as a condition precedent to arbitration and as a necessary step to be taken to preserve a claim "within 21 days after occurrence of the event giving rise to such Claim." (Stephenses' Post-Hr'g Br. at 11–13, 33–36; Gen. Conditions § 4.3.2.)  In total, the Stephenses devoted twenty-seven pages to the claims involving doors in their brief to the arbitrator. (Stephenses' Post-Hr'g Br. at 25–51.) The Stephenses made no attempt to challenge the arbitrability of these claims in a judicial proceeding instead of voluntarily

presenting them to the arbitrator.  Rather, they offered the same

proposition in the introduction to their post-hearing brief that

the Court relies on below to evaluate the merits of their

argument:

> The Arbitrator has the authority to
> determine threshold matters such as whether
> the parties have agreed to submit particular
> issues to arbitration and whether a party has
> satisfied procedural preconditions of
> arbitration.  Such procedural arbitrability
> questions generally should be decided by
> arbitrators rather than by a court and
> allowing arbitrators to decide such issues
> furthers public policy of minimizing the role
> of the courts in the arbitration process.

(Id. at 11 (citations and internal quotation marks omitted).)

The arbitrator did not exceed his powers by evaluating the claims

that the Stephenses submitted to him.  See Nghiem v. NEC Elec.,

Inc., 25 F.3d at 1440.

### 2. The Arbitrator's Authority to Determine Whether the Preconditions for Arbitration Had Been Met

Even if the Stephenses had raised their argument

concerning submission of claims to the architect in a judicial

proceeding instead of voluntarily submitting those claims to the

arbitrator, the argument would have failed.  Whether the

contract's preconditions for arbitration had been met was a

question for the arbitrator to decide.  See Howsam v. Dean Witter

Reynolds, Inc., 537 U.S. 79, 84 (2002) (citing John Wiley & Sons,

Inc. v. Livingston, 376 U.S. 543, 557 (1964), for the proposition

that "an arbitrator should decide whether the first two steps of

a grievance procedure were completed, where these steps are prerequisites to arbitration").

The Court cannot revisit the arbitrator's factual determinations that "[i]t was evident from the parties' course of conduct and dealing that they effectively removed the Architect from the Contract administration process" and that "multiple Contract provisions related to change orders, payment, and submission of claims to the Architect for initial decision were ignored by both [sides]." (Final Award at 5.) Given those determinations, the arbitrator's conclusion that both parties "effectively waived whatever rights they might otherwise have had . . . to challenge one another's claims on the grounds that those claims were not timely submitted to the Architect for initial decision as a condition precedent to arbitration of those claims" was plausible.[16] (Id.); see also Brasfield & Gorrie, L.L.C. v. Soho Partners, L.L.C., 35 So. 3d 601, 606 (Ala. 2009) (evaluating what appear to be the same contract provisions and holding that "[the] contractual obligation to submit claims first to the

_____

[16] The Stephenses seem to characterize the door claims as Metzler's, although this characterization is incongruous with both the Final Award and the parties' post-hearing briefs. (Cross-Pet. Mem. at 26; Final Award at 11–20; Stephenses' Post-Hr'g Br. at 25–51; Mot. Mem. Ex. J at 99–115.) Apparently the Stephenses' position is that they were permitted to submit the door claims to the arbitrator but Metzler was not permitted to defend those claims. The Court need not address this proposition because the arbitrator's determination that the condition precedent had been waived was plausible.

architect for decision and then to mediate before invoking arbitration is the same kind of condition precedent to an obligation to arbitrate that <u>Howsam</u> presumed would be decided by the arbitrator.") (internal quotation marks omitted).

**C.**      **Metzler's Motion to Confirm**

Having evaluated the Stephenses' petition to vacate the arbitration award, the Court turns to Metzler's motion to confirm it.  The award must be confirmed if it has not been modified, corrected, or vacated.  <u>See</u> 9 U.S.C. § 9.  The Stephenses have not demonstrated that the award should be vacated, and have not argued that the award has been or should be modified or corrected, so the Court is bound to confirm the award and will do so.

Metzler also asks that the Court expressly find that Metzler has satisfied all amounts owing under the arbitration award.  Based on the exhibits to Metzler's motion, which include a copy of a check for the amount owed and a receipt for its delivery to one of the Stephenses' attorneys, the Court so finds. (Mot. Mem. Exs. N–O.)

The Court denies, however, Metzler's request for attorneys' fees under section 658A-25 of the Hawaii Revised Statutes.  As the Court noted above, <u>see</u> <u>supra</u> Part II, the Federal Arbitration Act governs the Court's evaluation of both Metzler's motion to confirm and the Stephenses' petition to

vacate.  Attorneys' fees are not available under the Federal

Arbitration Act.  <u>See</u> <u>Menke v. Monchecourt</u>, 17 F.3d 1007, 1009

(7th Cir. 1994) ("[T]here is nothing in the Federal Arbitration

Act which provides attorneys' fees to a party who is successful

in seeking confirmation of an arbitration award in the federal

courts.").

## V. CONCLUSION

        For the foregoing reasons, the Court: (1) GRANTS in

part and DENIES in part Petitioner and Cross-Respondent Metzler

Contracting Co. LLC's Motion to Confirm Arbitration Award; and

(2) DENIES Respondents and Cross-Petitioners Elle Stephens and

Paul Stephens's Petition to Vacate Arbitration Award.

        IT IS SO ORDERED.

        DATED:  Honolulu, Hawai'i, February 28, 2011.



_____
Alan C. Kay
Sr. United States District Judge

<u>Metzler Contracting Co. v. Stephens</u>, Civ No. 10-00516 ACK-BMK: Order Granting
in Part and Denying in Part Petitioner's Motion to Confirm Arbitration Award
and Denying Respondents' Petition to Vacate Arbitration Award

-33-